Filed 12/26/25  In re Ethan B. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re ETHAN B. et al., Persons Coming Under Juvenile Court Law. | B345077<br><br>(Los Angeles County Super. Ct. No. 24LJJP00305) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>JOSE B.,<br><br>     Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Debra L. Gonzales, Judge Pro Tempore.  Dismissed in part, affirmed in part.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Appellant.

_____

In 2024, plaintiff and appellant Los Angeles Department of Children and Family Services (DCFS) filed a petition under Welfare and Institutions Code section 300 on behalf of Aidan M. and Audrey G. (children of mother Roxana B.) and Ethan B. and N.B. (children of both Mother and defendant and appellant father Jose B.).[1]  Father appeals the juvenile court's orders: (1) finding jurisdiction over Aidan, Ethan, and N.B.; (2) removing Ethan and N.B. from his custody; and (3) ordering his visits with Ethan and N.B. be monitored.  DCFS states that, in the event we agree the court erred in finding jurisdiction over Ethan and N.B., it cross-appeals the juvenile court's order striking Ethan and N.B. from certain counts in the petition.

After appellate proceedings commenced, the court issued a subsequent order that Father have unmonitored visits with Ethan and N.B.  Nothing in the record indicates any party appealed this order.  Therefore, Father's appeal regarding monitored visitation is moot.

We additionally conclude substantial evidence supports the court's orders finding jurisdiction over Aidan, Ethan, and N.B., and removing Ethan and N.B. from Father's custody.  Because we

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.  Mother is not a party to this appeal.

2

are affirming the court's finding of jurisdiction over Ethan and N.B., we need not consider DCFS's contention of error. Therefore, we dismiss as moot DCFS's cross-appeal and the portion of Father's appeal regarding monitored visitation and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother has five children: Y.M.,[2] Aidan M. (born September 2008), Audrey G. (born July 2010), Ethan B. (born March 2014), and N.B. (born July 2019). Mario M. is the father of Y.M. and Aidan, Jaime G. is the father of Audrey, and Jose B. (Father) is the father of Ethan and N.B. Mother and Father met in 2012 and married in 2016.

### A. *DCFS Investigates a Referral*

### 1. Initial Investigation

In September 2024, DCFS received a report that Aidan told Y.M. that Father was sexually abusing Audrey by putting his penis in her while she was sleeping. When Aidan told Mother, Father "got mad" and tried to "put hands on" Aidan; Father also tried to "change things around," accusing Aidan of going into Audrey's room and pushing her. The reporting party stated that "[r]ight before" Y.M. moved out of the family home in August 2024, Y.M. witnessed Father put his finger in Audrey's vagina. Additionally, the reporting party claimed Father committed domestic violence towards Mother in the children's presence, and once hit Mother in the stomach when she was pregnant with N.B.

---

[2] The record does not reveal Y.M.'s birthdate but notes she was 18 years old in September 2024.

### (a)   Y.M.

A children's social worker (CSW) called Y.M., who reported an incident where Father punched a hole in the door to Aidan's room, after Ethan complained to Father that Aidan was being loud.  Y.M. heard Aidan say, "You're dirty[,] you raped my little sister."  Father then grabbed a phone charger and started hitting Aidan.  Y.M. then jumped on Father and told him to stop.

After this incident, Y.M. witnessed Father stick his fingers in Audrey's vagina.  The sisters shared a room and one night, Y.M. saw Father enter the room, go to Audrey's bed, remove her pants, and put his fingers inside of her.  Y.M. did not know what to do, so she said, "Audrey get up!"  Audrey awoke, and Father became angry.  Although Audrey was very private, she revealed to Y.M. that Father had "touched [Audrey] everywhere," and Y.M. recalled that she had previously heard Audrey "threaten [Mother] about social workers."

Y.M. recalled that when she was younger, Father "did that to me," disclosing that Father also removed her clothes and put his fingers in her vagina.  He touched "everything" on her body and put his penis inside her vagina three to four times.  Father told her not to tell Mother, and Y.M. never did.  Y.M. stated the last time it happened, she was in middle school.

### (b)   Maternal Grandmother

The CSW spoke with the maternal grandmother (MGM), with whom Y.M. was staying.  MGM confirmed Y.M. had told her the things she told the CSW, and MGM had told Y.M. that, if the allegations were true, Y.M. needed to report it.  MGM claimed Father was controlling and forbade Mother from talking to Mother's sisters.  MGM recounted a recent call in which Mother was crying because Father "was cheating on Mother again" and

4

wanted to leave her.  MGM told Mother she deserved better, but Mother said she would not leave Father "because of economic support."

### (c)    Aidan

The next day, the CSW interviewed Aidan and Audrey at their school.  Aidan confirmed Father hit him twice in the leg with a cell-phone charger, after Aidan refused Father's demand that he vacate the room he shared with Ethan and go sleep in the living room.  Aidan then angrily yelled at Father, "You're dirty. You raped my sister."  Aidan said that sometimes at night, when he could not sleep and Mother was at work, he would hear "sexual moaning from Audrey's room," which was next to his. Once, when he opened the door, he saw Father sitting on the edge of the bed, and Audrey facing the wall.  Aidan also related that Audrey had told him while crying that Father "stuck his penis in her."  Aidan stated the last time he remembered seeing Father in Audrey's room was "a couple of weeks ago."  Aidan expressed his belief that Mother knew of the situation because, the night Father hit him and he accused Father of raping Audrey, Mother, Y.M., Audrey, and Father "were arguing," and Father "left the house that night."  Father and Mother later told Aidan not to talk to Y.M. because, if he did, Father "is going to go to jail."

When asked when he last spoke with his father, Mario, Aidan responded, "[Father] doesn't let us talk to him."  When asked how he was disciplined, Aidan said Father "disciplines him with a belt, hanger, or charger" and the parents "also yell at him."  He added Ethan "gets 'whooped' with a belt, but his youngest brother [N.B.] does not."  Aidan claimed Father was "nicer" to Ethan and N.B. and that Ethan would never say

5

anything bad about Father. Aidan also remembered Father hitting Mother when she was pregnant with N.B.

### (d)   Audrey

When the CSW spoke with Audrey and asked if she had ever seen Father hit Aidan, Audrey immediately said, "[Y.M.] is making it up. She left the house because she likes going out and doing her own thing. She's mad at my parents. They are going through a divorce but trying to make things work." When the CSW asked Audrey about her own observations, she denied seeing Father hit Aidan, opining Aidan had "anger issues." She also stated "my dad [referring to Father] is not home a lot. He works and then goes to the gym." She claimed the parents disciplined her and Aidan through yelling or taking away phones, sometimes sending Aidan to his room; Ethan and N.B. never got in trouble. She denied any domestic violence between Mother and Father and any sexual abuse. She denied ever telling Aidan Father raped her. When asked why Father went to her room at night, she responded, "He lies on the bed with us and just goes in to check on us." Audrey added that sometimes they talked, and sometimes Ethan was there, too. When the CSW recounted Y.M.'s statement that Father "was in the room doing something to Audrey and" Y.M. woke her up by yelling, Audrey denied it ever happened.

### (e)   Mother

Later that day, the CSW was able to speak with Mother at the family home. Mother explained Aidan "has autism and anger issues." Mother recounted that, on the day of the incident between Father and Aidan, she reminded Aidan to do his chores after she got home from work. Aidan, who was playing video

6

games, called Mother a "bitch," and Mother "yelled . . . back." Aidan then grabbed Mother's wrist and pushed her. Mother "got scared of Aidan because when he is mad, he has no self-control." After Father returned home and learned what had happened, he "got upset with Aidan and told him he had to respect" Mother. Aidan responded by calling Mother a "puta" and punching his door. Father called him ungrateful, and Aidan began insulting Father and called him a rapist. Mother asked Aidan why he was saying that, and Father said, "If I'm a rapist, here is my phone and call 911." Aidan would not call. Aidan said "he just felt like saying it." Father then took away Aidan's laptop charger "because they had an issue with Aidan staying up until 2am on the laptop." Mother denied Father ever hit Aidan. After the incident, Mother stated she had a conversation with Y.M. and Audrey about sexual abuse, and they denied Father "had done anything to them." Mother believed they would tell her "if something was wrong because she had talked to them about sexual abuse in the past." Mother also denied any domestic violence.

Mother claimed Y.M. "made up the entire referred incident." She said Y.M. "had been saying she was going to leave since she turned 18" and wanted to live with MGM or Mario. She explained Y.M. essentially moved out one day without telling her, and when she called MGM to see if Y.M. was there, MGM began insulting her, saying Y.M. did not want to live with her anymore, and to accept it. Mother became upset when she learned Mario was there, claiming Mario used drugs and hit her when Y.M. and Aidan were young. Mother admitted MGM told her that Y.M. claimed Father had raped Y.M., but denied Y.M. had ever told Mother this information.

7

As for Audrey, Mother stated that when she picked her up from school that day and learned the CSW had spoken with her, she told Audrey to "tell the truth" and asked whether Father had "do[ne] anything" to her; Audrey said he had not. Mother claimed Father had never given her a reason to believe he "would do anything to them" and swore she would have called the police if she knew anything. Mother reported MGM has held a grudge against Father since an incident in which Father "kicked MGM out of [Mother and Father's] home." Mother claimed MGM had threatened Father in the past, saying he would "pay" for what he had done to her.

### (f)  Ethan and N.B.

The CSW also spoke with Ethan, who denied Father hit Aidan or anyone else. N.B., who was two years old, was uninterested in speaking with the CSW.

### 2.  Aidan and Audrey Leave the Home

The CSW explained to Mother that, due to the inconsistent statements provided by the family, DCFS needed to implement a safety plan: either Father or Aidan and Audrey needed to leave the home for seven days while the investigation progressed. Mother vetoed Father leaving because he watched the children when she worked. Mother then informed Audrey she would need to leave the home, and Audrey refused. The CSW advised Mother to look for friends who could help her; as she was doing so, the CSW heard a large bang, and Audrey yelling, "Fuck you bitch! I hate you!" Mother was "nonchalant" and explained Audrey and Y.M. were now "fighting because of this." Aidan also refused to leave.

The CSW made suggestions for arranging the children's care, but Mother "had an excuse for everything." After Mother continued to have trouble arranging care for Audrey and Aidan, the CSW informed Mother "a plan needed to be developed forthwith, or the children could be taken into protective custody due to immediate safety concerns." The CSW explained part of the plan would be to allow the children to receive a forensic exam. Mother then said, "You do know that Audrey is having sex already?"

When one potential solution for someone to watch Aidan required a phone call to Mario, the CSW called Y.M. to get Mario's number. The CSW noted she was crying and asked why. Y.M. explained "Audrey was mad at her because they were taking her away and Audrey would not say the truth."

Mother found someone to watch Audrey but refused to permit Aidan to go with MGM or Father, stating she would prefer DCFS put him into foster care. She eventually found another friend to care for Aidan. After the children had packed, Mother searched Aidan's bag and removed his laptop and all electronics, stating she did not want him to contact Y.M. or MGM.

### 3. DCFS Speaks With Father

The next day, a CSW spoke with Father. Regarding the incident with Aidan, he explained Aidan was angry with Mother for taking away his laptop and had pushed her and pulled her left arm. When Father asked what was going on, Aidan tried to fight him. When Father tried to unplug the laptop charging cord, Aidan tried to stop him, and Father "possibly hit him with the cord" on accident. Aidan then "became more defensive trying to hit him" and Father told him, "If you hit me[,] you won't be able to handle me." Aidan yelled back that Father was a "pervert"

9

and accused him of "go[ing] into the girls' bedrooms all the time." Father responded it was his "duty" to go into the bedroom to "check things are okay."[3] Father claimed Y.M. was present and when he asked her whether what Aidan was saying was true, she said it was not. Mother and Father then told Aidan if he repeated himself in school, Father could go to jail. Father claimed Aidan apologized to him later that night, and that he had no further trouble with Aidan.

Father described Y.M. as "manipulative and unaware of consequences." He related an incident in which Y.M. falsely accused a school bus driver of groping her because she wanted Mother to drive her to school in a new car the family had purchased. Father also claimed MGM told Y.M. if she ever wanted something, "she had to play the role of a sexual abuse victim." Father asserted Aidan was easily influenced by Y.M., and Y.M. had told him if he moved in with MGM, he would get a phone. Father said MGM "hates" him because years ago, when MGM lived with them, she tried to take Y.M. and Aidan to see Mario without telling them. When Father confronted her, MGM "became offended" and claimed Father was just looking for an excuse to kick her out. Father was unapologetic, and MGM moved out. On her way out, she threatened that "at any moment," she could "fuck up [Father's] life." Father retorted, she could only do so by lying, because he was not Mario or Jaime.

### 4. DCFS Speaks With Y.M. and MGM Again

On the same day the CSW spoke with Father, she received a call from a sheriff's deputy who stated the report would be

---

[3] Father later told the CSW he went into the children's bedroom at night to go through their phones.

closed with "No Crime Suspected." The deputy said other deputies had interviewed Aidan, who now denied the allegations. Mother also played a voicemail for the deputy in which Y.M. told Father, "If you don't leave my mom alone, I am going to tell everyone you raped me." The deputy opined Y.M. was upset because Father "has a mistress" and wanted him and Mother to "break up."

### (a)    Y.M.

The CSW spoke with Y.M. at MGM's home, asking her to try to remember the sexual abuse incidents involving her. Y.M. claimed Father began abusing her immediately after they began living together, probably when she was in kindergarten. She stated Father implemented a rule when Mother went to the store that she could take only two kids. Once, when Y.M. was the child not taken, Father suggested they play "mami y papi." Y.M. agreed and shared her dolls, and Father began touching her vagina. Y.M. stated her memory was "blurred regarding those events." Y.M. asserted Father "stuck his penis in her multiple times while growing up" and she was in middle school when he stopped raping her. Y.M. said she was afraid to tell Mother, and she did not learn she was raped until they watched a video about sex in middle school.

Y.M. also reported that Father once hit Mother in the stomach when she was pregnant with N.B. Y.M. stated Aidan pushed Father—the record is unclear if this was part of the same incident as Father punching Mother—and Father hit Aidan. Y.M. characterized Father as "very bossy" and "nosey." Y.M. said she had told both Aidan and Audrey about Father's abuse of her.

Regarding the incident with Aidan, Y.M. reported Father asked Aidan for his computer after Aidan and Ethan were

11

arguing over it.  Father then began hitting Aidan with the charger.  Y.M. told Father to stop, and Aidan began yelling "rapist" and telling Father to leave the house.  Y.M. told Father if he hit them again, she would call the police and tell them what he did to her.  Mother then asked what they were fighting about, and Y.M. told Aidan not to say anything and refused to tell Mother both because she was not ready and because she had a friend sleeping over and did not want the friend to wake up and "hear the drama."

Regarding the incident with Audrey, Y.M. claimed she was awake in the room she shared with Audrey with the lights off when Father slowly opened the door and "flashed his cellphone light" at them to see if they were sleeping; Y.M. pretended to be asleep.  Father then walked toward Audrey's bed and was "shuffling her shorts."  From the light outside the bedroom door, Y.M. could see Father "sticking his fingers in her."  Y.M. then yelled, "Audrey get up!"  Audrey woke up and Father ran out of the room.  Y.M. stated this was the first time she saw Father do anything to Audrey.  Y.M. said a few weeks later, she was walking with Audrey in a park when Audrey told her Father had "touched me everywhere, but I don't care anymore and I don't want to talk about it."

On the day Y.M. moved in with MGM and Mother called looking for her, a maternal aunt who was present told Mother that Father was a rapist, and she should leave him.  Mother became upset and hung up.  The next day, Mother called MGM crying because Father had a girlfriend.  When MGM told her to leave Father, Mother again hung up.  Y.M. called Mother back and told her the same thing; Mother hung up on Y.M., too.  Y.M. was "furious," so she left Father a voicemail "telling him to leave

12

her mother alone, get out of the house, and leave or else she would tell everyone that he raped her." Mother then called Y.M. back to tell her to leave Father alone.

Y.M. stated that "the other day," Aidan called to tell her he saw Father in bed "doing something" to Audrey; he was unsure what. Y.M. also called Audrey's boyfriend and asked whether Audrey had ever said anything about Father. The boyfriend related that Audrey claimed to have been touched by "one fat man" and by Father, but said she did not care.

### (b) MGM

MGM stated that, on the day she and Mario picked Y.M. up from the family home, Y.M. cried and told her Father had been raping her since she was little, when Mother was not home. MGM told Y.M. that she needed to report it, that these were serious accusations, and that, if she was lying, she could go to jail.

Regarding Audrey, MGM stated she had also spoken with Audrey's boyfriend, who told her that Audrey said she had been raped by "an older fat man with a mustache" and by Father. MGM claimed the "older fat man" was her brother, Audrey's great-uncle. MGM said that, when Audrey was five, Mother called her and asked, "Can you believe Audrey is saying that Tio H[.] touched her?" When MGM told Mother to report it to the police, Mother said, "What if she's lying. Then this will create a mess." MGM also confirmed what Y.M. stated about her conversations with Mother about leaving Father.

13

### 5. DCFS Speaks with Maternal Aunt Veronica

Veronica confirmed being present when Y.M. told MGM about Father's sexual abuse. She stated Y.M. also said she had told Mother about the abuse, and Mother had done nothing. Veronica reported that when Mother first married Father, he mistreated Y.M., Aidan, and Audrey, hitting them with a belt and pulling on their ears. Mother "would never tell him anything."

### 6. DCFS Speaks With Mario

Mario confirmed MGM's account of picking Y.M. up and hearing Y.M. accuse Father of sexual abuse. Mario added Y.M. had previously stated she was being abused but had refused to provide details. He was also present when Mother called MGM and heard Mother accuse Y.M. of "inventing things." Mario offered to take Y.M. to the police, but she did not want to go.

### 7. Audrey Undergoes Forensic Interview

Audrey denied being abused by Father but based on her responses, the interviewer suspected "something is happening in the home." "Audrey was quick to deny allegations about any sexual abuse, inappropriate comments, and denied any comments by [Father] that made her feel uncomfortable before the interviewer even asked." Although Audrey denied sexual abuse by Father, she claimed she was abused by her maternal great-uncle, something she said she had reported.

The CSW later learned from Nancy T., the family friend with whom Audrey had been staying, that Audrey confirmed Father and Aidan "had gotten in several physical altercations."

### B. *DCFS Files a Petition*

On September 24, 2024, the court granted a removal order for the children. Aidan was released to Mario, Audrey was placed with MGM, and Ethan and N.B. were placed with a paternal great-aunt.

The next day, the CSW spoke with Audrey's ex-boyfriend, with whom she had broken up with four days ago. The ex-boyfriend confirmed, two months ago, "Audrey confessed to him that [Father] had been sexually abusing her since she was a little kid. He reported that Audrey told him that [Father] touches all her private areas. She told him that he does it at night when she is sleeping. He denied knowing about actual penetration. He reported that Audrey told him that [Y.M.] and Aidan knew because she told them." When asked why Audrey told a different story, the ex-boyfriend reported Audrey also told him she did not want Father to go to jail or the children to go into foster care. The ex-boyfriend forwarded the text messages Audrey sent him, describing the abuse. In the text exchange, Audrey stated she had told Aidan and Ethan about the abuse but was unsure if they believed her. According to the text messages, Audrey also told Mother, but Father denied the accusations, and Mother did not call the police.

In September 2024, DCFS filed a petition under section 300, subdivisions (a), (b)(1), (d), and (j), on behalf of all the children. Count a-1 alleged Father physically abused Aidan, striking him with a belt, hanger, and cell-phone charger. Count a-2 alleged Mother and Father engaged in a "violent[,] physical altercation" in Aidan's presence, and Father struck Mother while she was pregnant with N.B. Both counts alleged Father's acts placed the other children at risk of physical harm, too.

Counts b-1, d-1, and j-1 alleged Father sexually abused Audrey—as well as the children's now-adult sibling Y.M. when she was a minor—and Mother knew about Father abusing Audrey but still allowed Father access to her.

Counts b-2 and j-2 contained the same allegations of physical abuse as count a-1, and counts b-3 and j-3 contained the same allegations of domestic violence as count a-2, but additionally alleged Mother knew of the abuse and failed to protect the children by allowing Father access to the children.

At the detention hearing, counsel for DCFS asked the court to keep the children detained from the parents, to permit Mother to have monitored visits with the children, to permit Father to have monitored visits with Ethan and N.B. only, and to order Father to have no contact with Aidan and Audrey. Counsel for Aidan, counsel for Audrey, and counsel for Ethan and N.B. expressed their clients' desire to return home to Mother—Ethan and N.B. wanted to return to Father as well—but stated that, under their duty per section 317, subdivision (e), they agreed or would not argue against DCFS's recommendation to detain the children from Mother (and Father as well, in the case of Ethan and N.B.).[4] Mother's counsel argued the children could be returned home with safety measures put in place. Father's counsel asked the court to release the children into his and Mother's custody with safety measures put in place or, if the court were not inclined to do so, to release them to Mother with

_____

[4] Section 317, subdivision (e) provides in pertinent part: "When counsel is appointed to represent a nonminor dependent, counsel is charged with representing the wishes of the nonminor dependent except when advocating for those wishes conflicts with the protection or safety of the nonminor dependent."

16

safety measures put in place. The court found a prima facie case to detain all children from both parents. The children were to remain with the relatives with whom they were placed, with DCFS being given discretion to place Audrey with Nancy T., whom she preferred to stay with. The court granted the parents monitored visits.

## C.   *DCFS Conducts a Pre-Release Investigation*

### 1.   Viviana C.

On September 30, 2024, a CSW received a call from one of Mother's friends, Viviana C. Viviana reported that her daughter and Audrey were friends and once, after her daughter had slept over at Audrey's house, she reported to Viviana that Audrey kept a knife under her pillow, and had warned her daughter to "be careful." During a second sleepover in February 2023, when both Viviana's children slept over at Audrey's house, Audrey and Y.M. slept in their room, and Viviana's daughters slept in the office. One daughter reported that, when she got up during the night to use the bathroom, she saw Father in Y.M. and Audrey's room without a shirt. Viviana stopped letting her children sleep over after that.

Shortly after the second incident, Mother had a weeklong trip planned and asked Viviana if Y.M. and Audrey could stay with her; Viviana agreed. Before Mother left, she insisted Viviana not let Y.M. and Audrey go home under any circumstances because "[y]ou just never know, you know?" After driving Mother to the airport and returning to her home, Viviana spoke with Y.M. and Audrey about sexual abuse and asked the children whether Father had ever "touched" them. The girls "quickly looked at each other and then looked down and said

17

'No.'" After a little more probing and assurances they were safe, Y.M. admitted Father "had been touching her since she was 'little.'" "Audrey began to disclose as well. [Viviana] reported that both girls shared with her that there were times that they would wake up nude, or their underwear missing, and not know how this occurred. She reported that Audrey told her that on one occasion, she woke up and she had 'oil' all over her buttocks and back. She stated that Audrey also said that it hurt to walk after."

When Viviana asked when the abuse last occurred, Y.M. stated she did not remember, and Audrey said "about three weeks ago," when Mother left for the store. Father came into Audrey's room and tried to take her pants off. Y.M. discovered what was happening and pushed Father off Audrey, causing them to "tussle[] a bit." Mother returned home early because she had forgotten something, and Father ran out of the room. Mother saw Audrey was disheveled and asked if there was a problem; Audrey said nothing had happened. Shortly after this incident, Audrey and Y.M. were forced to share a room.

After the disclosures, both Y.M. and Audrey begged Viviana not to say anything. Viviana told them she needed to tell Mother. When Mother returned from her trip, Viviana "had a private detailed conversation with her about what the girls had reported." Rather than express concern, Mother said, "They are lying. They hate [Father] so much they are making things up. I will talk to them." Viviana and Mother became "very distant" after that conversation.

### 2. DCFS Speaks With Mother

In October 2024, a dependency investigator (DI) spoke with Mother as part of an ordered "Pre-Release Investigation." Mother denied the allegations, claiming "the information

provided was all a confusion and misunderstanding. Mother minimizes the situation and reports that the information provided by the minors was from a previous case with the father, Jaime G[]. For instance, the mother reported that the minor, Aidan observed father Jaime G[.] hit her while pregnant with Audrey," not Father. Mother denied any domestic violence between her and Father, or any physical discipline by Father. Mother denied any knowledge of sexual abuse by Father. Although Father had moved out of the home, Mother and Father continued to be in a relationship. DCFS concluded the children would be at "high risk of abuse and neglect if they are released" to Mother and recommended against it.

At the Pre-Release Investigation hearing, counsel for Aidan informed the court Aidan preferred to live with Mario and visit Mother on the weekends. Mother's counsel stated she would agree with Aidan's request, as well as with Audrey's request to stay with Nancy T. The court ordered Aidan to stay released to Mario and Audrey to stay placed with Nancy T., but ordered DCFS to arrange overnight, weekend visits with Mother. The court released Ethan and N.B. to Mother, while ordering them to remain detained from Father.

### D. *DCFS Continues Investigating*

The DI spoke with several individuals regarding the allegations.

#### 1. Mother

Mother maintained neither she nor Father ever hit the children. Regarding the incident with Aidan, she repeated it was an accident caused by Father and Aidan struggling over the laptop charger. Mother also denied Father ever hit her—she

19

again claimed Aidan was confusing an incident in which Jaime hit her when she was pregnant with Audrey. As for the sexual abuse allegations, Mother stated they were untrue, that Audrey had never told Mother anything about being abused, and that she believed MGM made the allegations and she "is not sure why."

### 2. Father

Father informed the CSW that he was adhering to his attorney's advice to keep silent.

### 3. Aidan

Aidan told the DI Father hit him with a computer charger and claimed he could not walk for two days. Aidan stated this was the only time Father hit him. Aidan said that while Mother and Father would argue, he never heard or saw Father hit Mother.

As for sexual abuse, Aidan recalled a time when Ethan and Audrey were sharing a room, and Ethan told Aidan that Father was "touching Audrey." However, Aidan did not see anything "inappropriate," and Audrey never told Aidan about such abuse. Y.M. told Aidan that Father would "touch Audrey" while Mother was at work.

### 4. Audrey

Audrey claimed Father did not hit Aidan or any of the other children. She also denied Father ever sexually abused her and stated she never saw him abuse Y.M. As to the text messages with her ex-boyfriend, Audrey said they were about her uncles, not Father. Audrey admitted Father would go into her room and lie down next to her, but claimed Ethan was also present.

20

### 5.   Ethan

Ethan stated he was in the room when Father was purported to have hit Aidan, and Father did not do so. He also denied there were any physical altercations between Mother and Father, and any sexual abuse by Father.

### 6.   Y.M.

Y.M. claimed that, one night after Aidan yelled at Ethan, she heard Father say, "I'm going to come to the room and whoop you." Father "got the charging cable and went inside Aidan's room." Aidan then told Father, "Your nasty ass rape my little sister [*sic*]." Y.M. heard Father hit Aidan, and she came out of her room and cursed at Mother and Father. Y.M. stated "she was going to open up" about what Father had done to her, "and he laughed and said, 'No one is going to believe you.'" Mother told Y.M. she did not believe what she was saying.

Y.M. also saw Father touch Audrey's vagina. She repeated her claim that Father used to "put[] his thing inside of" Y.M. Y.M. claimed she told Mother about it, but Father denied the accusations. Y.M. also claimed she saw Father punch Mother when she was pregnant with N.B.

### 7.   Maternal Aunt Veronica

Veronica stated that, after the family moved to Lancaster, she observed Father "mistreat the minors by hitting them and pulled Aidan's ear."[5] Veronica also had heard that, during the incident with Aidan and the charger, "Audrey got a knife and told

---

[5] While the record did not disclose when the family moved to Lancaster, Y.M. said it occurred when she was in the seventh or eighth grade.

[Father] to leave her brother alone." Veronica did not witness any domestic violence but "the girls" told her that Father would hit, yell, and insult Mother. She also said she did not recall when Y.M. first disclosed the abuse she was suffering, but it was "a while ago."

### 8. Maternal Grandmother

MGM told the DI the parents had promised Audrey a car if she denied the allegations. MGM played a video of Y.M., Audrey, and Aidan arguing in her home, and Aidan was heard telling Audrey to tell what Father did to her.

### 9. Nancy T.

Nancy T. stated she saw Audrey send a text message to Father that read: "I only want you to look at me as your daughter and not touch me. Do not mistreat my mom." Nancy T. also stated she saw a message from Audrey's ex-boyfriend to Father stating: "You should be in jail for what you have done."[6]

### E. *The Court Finds the Children Dependents*

In a November 2024 last minute information, DCFS told the court Audrey "tested positive for a medical condition that is sexually transmitted." Immediately prior to the initial adjudication hearing (which was continued so the parties could participate in a settlement conference), the court ordered that Father, Ethan, and N.B. be tested for the same issue, over the

---

[6] The record does not disclose how Nancy saw this message.

"vehement[]" objection of Father's counsel.[7]  The court also encouraged Mother to test for the same issue, although it did not order her to do so.

In a December 2024 last minute information, DCFS told the court that Audrey had received treatment for her medical condition but that both Mother and Father had canceled their appointments to be tested and had not rescheduled them.  Aidan, Ethan, and N.B. all tested negative.  Y.M. tested positive.  A Public Health Nurse stated that both Y.M. and Audrey's medical condition was "early" meaning that "acquisition occurred 2023-2024.  'DPH has a confirmed diagnosis and clinical findings to support sexual abuse vs. a verbal/historical report by a person.'  The medical condition is acquired through sexual contact by an infected person."

In another December 2024 last minute information, DCFS told the court that a CSW had observed some of Father's belongings in the family home, and that both Mother and Father confirmed that, when the case closed, he would return to the family home.

At the January 2025 adjudication hearing, counsel for DCFS asked the court to sustain each count brought in the petition, pointing to Aidan's and Y.M.'s statements that Father physically abused Aidan and punched Mother in the stomach, text messages Audrey sent to her ex-boyfriend about Father's sexual abuse, and statements from family friend Viviana about Y.M. and Audrey informing her about Father's sexual abuse, and Mother's inaction.  Additionally, DCFS's counsel pointed out that

---

[7] On December 18, 2024, after Father filed a motion to reconsider the court's order that he test for the condition that Audrey had, the court vacated its previous order.

sexual abuse of a girl did "not mean the risk is nonexistent or so insubstantial that the court cannot take steps to protect the male siblings from such abuse," and that abuse of a stepsibling could also indicate risk of abuse of biological children. Here, Father was a father-figure in Aidan and Audrey's lives.

Aidan's counsel "largely" joined in the argument made by DCFS's counsel, except she requested the court dismiss the counts based on domestic violence between Father and Mother because there was insufficient evidence and there was no current risk to the children.

Audrey's counsel argued that Audrey was not at risk from any physical abuse or domestic violence between the parents. Audrey's counsel also expressed his client's position that the sexual abuse did not occur, and that Audrey felt safe around both Mother and Father. However, Audrey's counsel added that, as Audrey's "CAPTA guardian ad litem," he believed DCFS had met its burden regarding counts b-1 and d-1 (alleging Father sexually abused Audrey and Mother failed to protect her from the abuse).

Ethan and N.B.'s counsel asked the court to dismiss the domestic violence counts, arguing there was insufficient proof they occurred, and no evidence they put Ethan and N.B. at current risk of harm. Counsel conveyed Ethan's position that the sexual abuse did not occur, and that Ethan felt safe around Father, and then expressed his own request that the court make a specific determination of risk as to each of his clients. Finally, counsel asked the court to dismiss the physical abuse allegations regarding Aidan as to Ethan and N.B., as DCFS had failed to show a connection between those allegations and risk to Ethan and N.B.

Father's counsel asked the court to dismiss the petition in its entirety. As to domestic violence, counsel argued it was alleged to have occurred more than five years ago, and Aidan had stated he did not witness any such violence. As to the physical abuse of Aidan, Father's counsel argued it did not occur and there was no risk of harm to the children from the allegation. Finally, as to the sexual abuse allegations, Father's counsel again argued it did not occur and there was no risk of harm to Aidan, Ethan, or N.B.

Mother's counsel also asked the court to dismiss the petition in its entirety, arguing DCFS failed to prove any of the counts. Counsel urged the court to believe Audrey's denials of sexual abuse and to discount the text messages to the ex-boyfriend as a product of her anger toward Father for his infidelity. Counsel also argued that even if the sexual abuse occurred, there was insufficient evidence to conclude Mother knew about it and failed to protect Audrey. Counsel echoed other arguments that the domestic violence allegations did not occur. Finally, counsel argued there was no evidence Mother failed to protect Aidan from physical abuse.

DCFS's counsel countered that in Audrey's text messages, she indicated she had told Aidan and Ethan about the abuse, that the more reasonable interpretation of the conflicting evidence was that the sexual abuse had occurred, and that the fact that Father punched Mother several years ago did not mean the risk had abated.

As to counts a-1, b-2, and j-2 (regarding Father's physical abuse of Aidan), the court dismissed count j-2, amended counts a-1 and b-2 to strike allegations that Audrey, Ethan, and N.B. were in danger, and sustained those counts as amended. The court

found the physical harm Father inflicted on Aidan was nonaccidental and that "there is sufficient evidence to show that there were items used, including a cell phone charger, a belt, and a hanger, and that there were repeated infliction [*sic*] of the injuries."

The court dismissed counts a-2, b-3, and j-3 (regarding domestic violence), finding that the conduct occurred, but the evidence was "insufficient to show that the past conduct alleged in those counts presents a current substantial risk of harm."

As to counts b-1, d-1, and j-1 (regarding Father's sexual abuse of Audrey), the court sustained all three counts. The court found significant the text messages Audrey sent to her ex-boyfriend, Audrey's admission of the abuse to Mother's friend Viviana, and the text message to Father that family friend Nancy T. saw. The court also believed there was sufficient evidence to find Mother knew about the abuse and failed to protect the children. The court found that Aidan and Ethan were aware of the abuse as shown by Audrey's text messages, and all three brothers were aware of Father's and Mother's denial the abuse occurred. Discussing the sliding scale articulated by our Supreme Court in *In re I.J.* (2013) 56 Cal.4th 766, the juvenile court found "the magnitude of the harm is potentially very great" and that "the abuse occurred while the other children, that is Aidan, Ethan, and [N.B.], resided in the home."

### F.    *The Court Removes the Children*

Turning to disposition, DCFS's counsel asked the court to remove Aidan from Mother and release him to Mario, remove Audrey from Mother and Jaime, and remove Ethan and N.B. from Mother and Father.

Aidan's counsel agreed that he should be removed from Mother and released to Mario.

Audrey's counsel informed the court that Audrey wanted to live with Mother full time, but Audrey's counsel argued the court should remove her from Mother and Father and maintain her unmonitored visits with Mother.

Ethan's and N.B.'s counsel informed the court that both children wished to be released to Mother and Father, with Ethan again reminding the court that he felt safe with Father. However, counsel asked the court to remove both children from Father and release them to Mother.

Mother's counsel agreed that Aidan could be removed from Mother and released to Mario. Counsel argued Audrey should be released to Mother, citing the uneventful weekend visits that had been occurring. Counsel also argued Ethan and N.B. should be released to Mother.

Father's counsel argued that because he was not living with Mother, there was no current risk to Ethan and N.B., and the court should release those two to him. If the court were not inclined to do so, it should release them to Mother and grant him unmonitored visits.

The court removed Aidan and Audrey from Mother and Ethan and N.B. from Father.[8] The court released Aidan to Mario and released Ethan and N.B. to Mother. Father received monitored visitation with Ethan and N.B., with the court excluding Mother as a monitor.

Father timely appealed. DCFS timely cross-appealed.

_____

[8] The court also removed Audrey from Jaime.

## G. *The Court Terminates Jurisdiction*

In August 2025, the court held a section 364 hearing, awarding joint legal custody of Ethan and N.B. to both parents, and sole physical custody to Mother.  The court granted Father unmonitored visitation with Ethan and N.B. but noted that "[w]hile Father is incarcerated, the visits must be in compliance with the rules or policies of Father's facility."[9]  The court then terminated jurisdiction pending receipt of juvenile custody orders.  Two days later, the court received, signed, and filed the juvenile custody orders and terminated jurisdiction.[10]  Nothing in the record indicates any party appealed these orders.

---

[9] The record is silent as to why Father was incarcerated.

[10] Although the court awarded Father joint legal custody of Ethan and N.B., his appeal is not moot because the court awarded sole physical custody of the two children to Mother.  Were we to reverse the court's finding of jurisdiction over Ethan and N.B. due to Father's actions, the court's subsequent order awarding sole physical custody to Mother would potentially be erroneous as well (both because, if substantial evidence did not support a conclusion that Father abused the children, then substantial evidence also arguably would not support a conclusion that Mother failed to protect the children from Father and thus the court would lack a basis for jurisdiction, and because the court's exit order was presumably based at least in part on a finding that Father abused the children).  Moreover, were we to reverse the court's finding of jurisdiction based on Father's actions, Father could avoid the negative consequences arising from DCFS's requirement to report Father's abuse to the Department of Justice for inclusion in the Child Abuse Central Index.  (See *In re S.R.* (2025) 2025 Cal.LEXIS 7977, *2–*4 [DCFS's requirement to report abuse allegation to DOJ for inclusion in CACI renders case not moot].)

28

## DISCUSSION

### A.    *The Court Did Not Err in Finding Jurisdiction*

We review jurisdictional findings for substantial evidence. (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161–1162.)  "In a challenge to the sufficiency of the evidence to support a jurisdictional finding, the issue is whether there is evidence, contradicted or uncontradicted, to support the finding.  In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences.  Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court.  Evidence from a single witness, even a party, can be sufficient to support the trial court's findings." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450–451.)

Father argues the court erred in finding jurisdiction over Aidan, Ethan, and N.B.  We disagree.

### 1.    Aidan

The court found jurisdiction over Aidan under section 300, subdivisions (a) and (b)(1), because Father intentionally hit Aidan with various items "including a cell phone charger, a belt, and a hanger," and "there were repeated infliction [*sic*] of the injuries."  Father argues the court erred in finding jurisdiction under section 300, subdivision (a), because Aidan did not suffer serious physical harm and there was no history of repeated abuse.  The record belies his claim.

Aidan told a DI that after Father hit him with the charger, he could not walk for two days.  That constitutes serious physical

29

harm.[11]  Moreover, Y.M. stated she saw Father hit Aidan. Maternal aunt Veronica stated when Father first married Mother, he hit Y.M., Aidan, and Audrey with a belt and pulled on their ears.  Family friend Nancy T. told a CSW that Audrey had confirmed Father and Aidan "had gotten in several physical altercations."  That constitutes substantial evidence of repeated abuse.  "When a finding of fact is attacked on grounds that it is not supported by substantial evidence, the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the findings."  (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 598.)[12]

---

[11] Father cites to *Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72 for the proposition that "it is not unlawful for a parent to spank a child for disciplinary purposes with an object other than the hand."  *Gonzalez* is inapposite.  There, the appellate court reviewed whether a lower court had erred in substantiating a finding that a mother committed child abuse under the Child Abuse and Neglect Reporting Act when the Mother spanked her child on the buttocks with a wooden spoon because her hands hurt and spanking her daughter with her hand hurt the mother more than the daughter.  (*Id.* at pp. 75, 77, 80, fn. 8.)  The appellate court expressed no opinion on whether and when striking a child with an object warranted jurisdiction under section 300.

[12] Father also argues the court erred in finding jurisdiction over Aidan under section 300, subdivision (b)(1) because there was insufficient evidence that, at the time of the adjudication hearing, Aidan was at current risk of harm from Father.  Because we find the court did not err either in assuming jurisdiction under section 300, subdivision (a), we need not address this contention.  (See, e.g., *In re I.J.*, *supra*, 56 Cal.4th at p. 773 *(Fn. is continued on the next page.)*

30

## 2. Ethan and N.B.

The court found Father sexually abused Audrey on multiple occasions. It cited the text messages Audrey sent to her ex-boyfriend, Audrey's admission of the abuse to Mother's friend Viviana, and the text message to Father that Nancy T. saw. It then found that Father's sexual abuse of Audrey put Ethan and N.B. at risk, too.

Father contends substantial evidence does not support the court's findings that Father sexually abused Audrey, or that Ethan and N.B. were at risk from Father. We address each contention in turn.

### (a) Substantial Evidence Supports the Court's Finding that Father Sexually Abused Audrey

Father contends the court erred in finding Father sexually abused Audrey, citing Audrey's denials that the abuse occurred and arguing Y.M. and MGM "were motivated to get back at

---

[" 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence' "].)

Father also argues substantial evidence does not support the finding that Mother physically abused Aidan. Father fails to demonstrate how this finding aggrieved him; he thus lacks standing to appeal it.

31

Father."  Father expressly asks this court to "reweigh the evidence and substitute its judgment for that of the juvenile court."  That is not the function of an appellate court.  As stated above, "[w]eighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court."  (*In re Alexis E.*, *supra*, 171 Cal.App.4th at p. 451.) " ' " [W]hen two or more inferences can reasonably be deduced from the facts,' either deduction will be supported by substantial evidence, and a 'reviewing court is without power to substitute its deductions for those of the trial court.' " ' "  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)

Father also argues that the text messages from Audrey to her ex-boyfriend the court relied on were unreliable because "[t]he context indicates the sender was not Audrey" as they include the statement, "and Audrey even said it her self that she didnt call the cops for [N.B.] and ethan and all and he was like okay i understand [*sic*]."  Presumably, Father is arguing Audrey would not have referred to herself in the third person.  First, Audrey admitted she sent those messages.  Furthermore, the entirety of the text message in which "Audrey" was mentioned was: "i repeated everything i told my mom and stuff in front of him when he was saying it wasn't him and he was saying that im lying and stuff and he just kept on saying that we can do wtv we want with him like sent him to jail or something yk or that he can just move out nd my mom said no we're not gonna do that until we see that if was actually u and not adain and Audrey even said it her self that she didnt call the cops for [N.B.] and ethan and all and he was like okay i understand [*sic*]."  In context, it is reasonable to interpret the statement that "Audrey even said it

her self [*sic*]" to be part of what Mother said to Father, not something the sender of the text messages said.[13]

### (b) Substantial Evidence Supports Finding Jurisdiction Over Ethan and N.B.

"[A] father's prolonged and egregious sexual abuse of his own child may provide substantial evidence to support a finding that all his children are juvenile court dependents," including his sons, even "when there is no evidence the father sexually abused or otherwise mistreated the boys," the boys "had not witnessed any of the sexual abuse and were unaware of it before this proceeding began," and "[t]he boys said they felt safe in the home and liked living with their parents." (*In re I.J.*, *supra*, 56 Cal.4th 766, 770–771.) In *I.J.*, our high court concluded substantial evidence supported the juvenile court's finding of dependency because the father's behavior was " 'aberrant in the extreme' " in that " 'he sexually abused his own daughter "by fondling the child's vagina and digitally penetrating the child's vagina and forcefully raped the child by placing the father's penis in the child's vagina." ' " (*Id.* at p. 778.) Our Supreme Court also considered "the violation of trust shown by sexually abusing one child while the other children were living in the same home and could easily have learned of or even interrupted the abuse." (*Ibid.*) The court stated that "[s]exual or other serious physical

---

[13] Father also argues that because the messages contain the phrase "[I] didn't get out because idk if he would do the same to my sister," this indicates Audrey did not send the message. Father fails to explain why Audrey could not have been concerned Father would sexually abuse Y.M.

abuse of a child by an adult constitutes a fundamental betrayal of the appropriate relationship between the generations. . . . When a parent abuses his or her own child, . . . the parent also abandons and contravenes the parental role." (*Ibid.*) The Supreme Court concluded that "[t]he serious and prolonged nature of father's sexual abuse of his daughter under these circumstances supports the juvenile court's finding that the risk of abuse was substantial as to all the children." (*Ibid.*)

Here, while Audrey was not Father's biological daughter, he married Mother when Audrey was five or six years old, and was likely in Audrey's life at least from the time she was three years old (when Ethan, Father's biological son with Mother, was born). Father played a parental role in Audrey's life, and Audrey called him "dad." Like the father in *I.J.*, Father's abuse of Audrey was also " 'aberrant in the extreme' " in that he penetrated her vagina with both his fingers and his penis. Further, he did so while other children were in the home and could easily have learned of or even interrupted the abuse. Indeed, there is evidence that Y.M. interrupted the abuse several times, and that Aidan and Ethan were aware of the abuse. Additionally, while Audrey denied the abuse, she admitted that when Father lay in bed with her, sometimes Ethan would be there as well. On this record, substantial evidence supports the juvenile court's finding that the risk of abuse was substantial to Ethan and N.B.

Father argues the court erred in finding jurisdiction over Ethan and N.B. because there was no evidence that Father sexually abused either child or had a propensity to abuse boys. But, as our Supreme Court found in *I.J.*, these are not dispositive factors.

34

Moreover, as the juvenile court noted, "[T]he magnitude of the harm [to the other children] is potentially very great." "[T]he more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300." (*In re I.J.*, *supra*, 56 Cal.4th at p. 778.) Even if there were a lower probability that Father would abuse Ethan or N.B., the severity of his abuse of Audrey supports the juvenile court's conclusion that Ethan and N.B. were at substantial risk of harm.

### B.   *The Court Did Not Err in Removing Ethan and N.B. From Father*

The court found by clear and convincing evidence that Father placed Ethan and N.B. at substantial risk of harm and there were no reasonable means to protect them short of removal. Father argues the court erred in this finding because Father had followed the court's orders, Father had enrolled in programs before he was required to do so, and Ethan had said he felt safe with Father.

" 'On appeal from a dispositional order removing a child from a parent we apply the substantial evidence standard of review, keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence.' " (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.)

As discussed above, substantial evidence supports the finding that Ethan and N.B. were at risk from Father because of his sexual abuse of Audrey. Further, Father never admitted to his abuse of Audrey. "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) Thus, whether Father followed court orders or preemptively enrolled in programs, substantial evidence still supports the

court's finding that Ethan and N.B. were at risk from Father because he had not addressed the issues that resulted in their removal.

## C.    *The Issue of Monitored Visitation is Moot*

Father contends the court abused its discretion in requiring his visits with Ethan and N.B. to be monitored.  DCFS disagrees. We find the issue moot because, in August 2025, the court granted Father unmonitored visitation with Ethan and N.B., and nothing in the record indicates either party appealed this order. Therefore, even were we to agree with Father, we can grant him no effective relief.  (See, e.g., *In re D.P.* (2023) 14 Cal.5th 266, 276 ["A case becomes moot when events ' "render[] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief" ' "].)

## DISPOSITION

We dismiss as moot DCFS's cross-appeal and the portion of Father's appeal relating to the court's order of monitored visitation with Ethan and N.B.  The court's orders are otherwise affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

BENDIX, Acting P. J.            WEINGART, J.